*For affirmance*—The Chief-Justice, Trenchard, Parker, Kalisch, Black, Campbell, Lloyd, Case, Bodine, White, Van Buskirk, McGlennon, Kays, Hetfield, Dear, JJ. 15.

*For reversal*—None.

Thomas F. Bowes, appellant,

*v.*

William Bowes et al., respondents.

Nora Bowes, appellant,

*v.*

William Bowes et al., respondents.

[Decided May 20th, 1929.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Fielder, who filed the following opinion:

"As early as 1875 (and perhaps earlier) the partnership of Thomas Bowes and Brothers was formed, consisting of Thomas Bowes and his brothers Patrick, William, Richard and Thomas, for the purpose of engaging in the plumbing business. Little capital was put into the business, but the firm soon began dealing in Hoboken real estate and investments therein grew to large proportions. Real estate was purchased with the profits of the plumbing business, with contributions or loans made by the partners to the firm, with the proceeds of discounted firm notes and mortgage loans, with rents accruing from time to time and with the proceeds of real estate sales. All moneys received and expended on account of real estate were mingled with the receipts and expenditures from the plumbing business and a record of all receipts and expenditures, as well as of sums which the partners withdrew from the common fund for their personal use, was kept in books now in the possession

of the firm. Prior to 1882 title to all real estate purchased was carried in the name of Thomas Bowes, except two parcels, one of which stood in the name of Patrick and the other in the name of Richard, and nothing appears on the partnership books to indicate the respective interests of the partners therein. In August, 1882, Thomas executed deeds to his brothers conveying certain parcels to each in severalty; to Francis he conveyed 519 Willow avenue, 520 Grand street and a lot on the corner of Grand and Sixth streets, and thereafter the respective parcels were carried on the firm's books in the name of the partner to whom the same were so conveyed. Each partner's account was thereafter credited with rents collected by the firm from such properties and was charged with repairs, taxes and similar expenses and with cash withdrawals.

"Francis Bowes was the first member of the firm to die. He died December 15th, 1898, intestate, leaving him surviving his widow, Nora, and three children, two of whom died in infancy and one of whom, Thomas F. Bowes, born in or about 1890, still survives. As of the date of Francis' death, the account of the real estate conveyed to him in 1882, as aforesaid, shows total credits of $18,665 and total charges of $32,798.17, the account being overdrawn $14,143.17.

"Nothing was done toward the legal administration of Francis' estate until July 18th, 1900, when Thomas Bowes (a brother) was appointed administrator by the surrogate of Hudson county. He filed an inventory April 11th, 1902, in which he stated that Francis had a one-fifth interest in the partnership, which interest was valued at $7,000, less charges against the decedent for moneys drawn by him from the firm in excess of that sum and in May, 1902, he filed an account with the surrogate in which he stated that the one-fifth interest of Francis in the partnership, valued at $7,000, was actually without value because of his (Francis') liability to the firm of $14,143.17. The account further states that the administrator had transferred Francis' interest in the patrnership to William Bowes, in consideration

of the firm's claim against Francis' estate of $14,143.17. This account was duly allowed by decree of the orphans court, entered September 12th, 1902. The administrator executed to William an assignment of Francis' interest in the partnership. William executed a declaration that he held the interest assigned to him in trust for the equal benefit of himself and his brothers Thomas and Richard (Patrick having died March 26th, 1902); Nora Bowes, as guardian of her son Thomas F., executed an assent to and approval of said assignment, in consideration of the cancellation by the surviving partners of their claim against the estate of Francis and the surviving partners, Thomas, Richard and William, executed a surrender and cancellation of their said claim against the estate.

"The account standing on the firm's books in Francis' name was, after his death, continued in the name of his estate, and rents from the same properties were credited and the expenses of upkeep charged thereto, and there were also charged to said account moneys paid by the firm to Nora Bowes for the support of herself and her children, and on November 1st, 1901, the account, which at Francis' death was overdrawn $14,143.17, was further overdrawn $2,440.95, or a total of $16,584.12. On that day (November 1st, 1901) the books show that the overdraft of $16,584.12 was canceled by the allowance of $7,000 for Francis' interest in the partnership assets and the cancellation of the balance of the overdraft.

"Title to the 'Neff property' hereinafter referred to, was taken in the name of Thomas Bowes, January 10th, 1882, and on August 16th, 1882, he conveyed the same to William. 505 Bloomfield street was part of this tract and William apparently held title to this part for the equal benefit of Francis and Richard, because thereafter all rent from 505 Bloomfield street was credited to them equally and after Francis' death his one-half of such rent was credited to his estate to January 1st, 1902, after which date the full rent was credited to said estate.

"The firm of Bowes Brothers continued to manage the

properties standing in Francis' name and also 505 Bloomfield street, and continued to make payments to Nora Bowes to May 20th, 1918, on or about which date a final settlement was made with her and Thomas F. (only surviving child of Francis), who was then about twenty-eight years of age. It was found that from 1901 to 1918 the account of the estate of Francis Bowes had been overdrawn $6,459.55, and to reimburse the firm for this overdraft, Nora and Thomas F. Bowes conveyed to Thomas Bowes 520 Grand street and the lot on the corner of Grand and Sixth streets. At the same time William Bowes conveyed to Thomas F. Bowes the property 505 Bloomfield street. As part of this settlement, Nora Bowes, as guardian of Thomas F., and as doweress in Francis' estate, and said Thomas F. Bowes, as the only surviving heir-at-law of Francis Bowes, executed their releases to Thomas Bowes, administrator of the estate of Francis Bowes, releasing and discharging him from all claims which they might have against him as administrator. This settlement would seem to have disposed of all claims which the estate of Francis Bowes, Nora Bowes and Thomas F. Bowes could have had against the firm of Thomas Bowes and the individual members thereof, but seven years later, in November, 1925, a declaration of trust, dated September 15th, 1892, executed by William Bowes, was found in Bowes Brothers' safe by an employe of the firm, who delivered it to Nora Bowes shortly thereafter.

"The declaration of trust recites that William Bowes, with his brothers Patrick, Thomas, Francis and Richard, have for sometime past been engaged in the purchase and improvement of real estate in Hoboken and have taken title thereto in William's name; that the money for said investments and improvements was raised by mortgages on said real estate, by mortgages on individual real estate given by Patrick and Thomas and by promissory notes given by the partners, and declares that William will hold title to the real property therein described, first, to pay certain promissory notes all endorsed by the firm of Bowes Brothers for a total of $28,000; second, to pay mortgages given by Thomas and

Patrick on their individual property; third, to pay a balance due on contracts for the purchase of part of said real estate; fourth, to pay mortgages on the property described in the declaration of trust, and fifth, to hold said real estate in trust for himself, Patrick, Thomas, Francis and Richard, in equal parts and on demand to convey to each partner an undivided one-fifth thereof. The proofs show that the existence of this declaration of trust was unknown to Nora Bowes until it was handed to her in December, 1925, and that Thomas F. Bowes was unaware of it until July, 1926, and it is further shown that William Bowes made no conveyance to Francis of any part of the trust property. Nora Bowes filed her bill of complaint July 21st, 1926, seeking to have dower assigned to her in her husband's share of the trust real estate, and Thomas F. Bowes filed his bill of complaint August 31st, 1926, praying that he be decreed entitled to a one-fifth interest in said real estate as the only heir-at-law of his father, Francis Bowes, and further praying that an account be taken of the business done by Bowes Brothers, as plumbers and real estate investors. Both bills charge that the members of the firm concealed the existence of the declaration of trust from the complainants with intent to deprive them of their interest in the lands therein described. The defendants are William Bowes and James Bowes, the latter being a brother who was not a member of the firm, to whom William Bowes has conveyed some of the real estate. By agreement of counsel the cases were heard together.

"The defendants admit the declaration of trust and assert that Thomas Bowes, as administrator of Francis Bowes, accounted for Francis' interest in the partnership, which included his interest in the real property covered by the declaration of trust, and they set up the decree of the orphans court entered September, 1902, on such accounting, as conclusive against the complainants. They further assert that in May, 1902, Nora Bowes released Thomas Bowes, administrator, from all claims which she individually and as guardian of Thomas F. Bowes had against such administrator, and that in May, 1918, a final settlement was had between both com-

plainants and Thomas Bowes, administrator, wherein the complainants executed to said administrator a full release and discharge of their claims, and they plead said releases in bar of the complainants' claims. They also contend that the complainants' delay for nearly thirty years after Francis' death, in asserting their claims, has prejudiced the defendants in their defense, because the members of the firm, who had knowledge of the facts, are dead, except William Bowes, and therefore the complainants should be barred from relief. I have not considered the legal defenses presented by the defendants because I have reached the conclusion that, on the facts, the complainants are not entitled to the decrees they seek.

"It is a fact that Patrick died March 26th, 1902, that Richard died October 3d, 1916, and that Thomas died March 10th, 1925. It is also a fact that William, the sole surviving member of the firm, is between seventy-five and eighty years of age; that he is in feeble health and that his memory is gone. His appearance on the witness-stand and his inability to comprehend questions, so impressed counsel and the court that all refrained from attempting to obtain information from him concerning his firm's affairs. It is a further fact that no one who was in the firm's employ prior to Francis' death is available as a witness and the complainants have no knowledge concerning the firm's business. The position of the case practically is, that the complainants offer the declaration of trust in evidence and call for proof that the terms of this document, nearly thirty-five years old, have been performed. The rights of the partners under this instrument can only be determined from an examination of the firm's books and from other documentary evidence found in the firm's files, always bearing in mind that a charge of fraud, especially as among brothers who were associated as partners for twenty-three years, apparently without disagreement, cannot be presumed but must be clearly proven.

"On the firm's books is an account entitled "Real Estate Account," which is an account against all the property held in William's name and described in the declaration of trust,

except the 'Neff property,' and which also includes six other parcels, one of which was acquired by deed dated two years after Francis' death. Title to four of the six other parcels was in Thomas' name and two were in the name of Richard.

"Title to the 'Neff property' had been conveyed to William in August, 1882, and from the books and *Exhibit D-4*, the latter in Richard's handwriting, it appears that on or about January 1st, 1883, this property had been divided and portions thereof allotted to the partners according to the amount each had contributed to the purchase price. Each portion so allotted was entered on the books in separate accounts in the names of the respective partners, one portion, 505 Bloomfield street, being entered in the joint names of Francis and Richard, and from and after January 1st, 1883, Francis and Richard were each credited with one-half of the rent therefrom. Although all the 'Neff property' is described in the declaration of trust it was not included in the 'Real Estate Account' but was treated separately in the manner just stated.

"Upon Francis' death he owned in his own name 519 Willow avenue, 520 Grand street and a lot on the corner of Grand and Sixth streets. The surviving partners carried those properties on their books as owned by his estate and they also considered that his estate had a half interest in 505 Bloomfield street and a one-fifth interest in not only the rest of the property described in the declaration of trust, but in the six other parcels carried in the 'Real Estate Account.' I reach this conclusion from examining the books and *Exhibits D-1* and *D-5*, both in Richard's handwriting and produced from the files of Bowes Brothers. *Exhibit D-1* is an inventory apparently first made October 1st, 1901, and corrected November 1st, 1901, of all property carried in the 'Real Estate Account.' It shows the valuation given to each parcel, the mortgages thereon and the liability of the firm on notes, loans made the firm by certain partners, a liability to James Bowes (not a partner) and liability to Lucy Phillips, a relative of the brothers, for moneys due her from the firm. I would note here that the complainants do not question the real estate valuations shown on the inventory,

which valuations were proved to be fair by other testimony, nor do they dispute the amount of the mortgages or notes, nor the liability to James Bowes and Lucy Phillips. *Exhibit D-5* is an inventory dated November 1st, 1901, similar to *Exhibit D-1,* and shows the same real estate assets and the same liabilities as *Exhibit D-1,* and is apparently a corrected and final inventory. It shows that the value of all the property carried in the 'Real Estate Account' exceeds the total liabilities by $34;717.97, which excess must represent the firm's equity in such real estate. It also shows that this equity was divided by five, thus ascertaining the value of a one-fifth interest to be $6,943.59, or in round figures $7,000. As Francis was dead at the date of this exhibit and four partners were still alive, the inventory was evidently prepared for the purpose of ascertaining the value of Francis' one-fifth interest in the firm's real estate and it was probably the basis for the credit given on the books of $7,000 to the account with the estate of Francis Bowes under date of November 1st, 1901, and also the basis for the inventory filed in the surrogate's office April 11th, 1902, by Thomas Bowes, administrator of the estate of Francis Bowes, which states the administrator valued Francis' interest in the partnership at $7,000.

"The 'Neff property,' although apportioned among the partners January 1st, 1883, and carried on the books in their individual names from that date, was listed in William's declaration of trust of 1892. It was not included in the inventory, *Exhibit D-5.* If it should have been been included because mentioned in the declaration of trust, then Francis was not entitled to a half interest in 505 Bloomfield street, which the books treated as belonging to him and Richard, but he had a one-fifth interest in the entire 'Neff property.' Testimony as to the value of that property as of the date of Francis' death shows it to have been worth a total of $25,300, of which Francis' share would be approximately $5,000. The testimony also shows that 505 Bloomfield street was then worth $5,800. Beginning January 1st, 1902, the full rent from this property was credited to the estate of

Francis Bowes and in 1918 the property itself was conveyed by William to the complainant, Thomas F. Bowes, so that Francis' estate and his only surviving heir received its and his full share of the 'Neff property.'

"Returning to the firm's books and to *Exhibit D-5*, they show that Francis' interest in the firm real estate as of November 1st, 1901, to have been approximately $7,000 and that on December 15th, 1898, Francis owed the firm an overdraft of $14,143.17, which on November 1st, 1901, by reason of payments made to his estate, had increased to $16,584.12. In April, 1902, Francis' administrator sold his interest in the firm to William, in consideration of which the surviving partners canceled their claim of $16,584.12 against Francis' estate. The firm continued to collect the rent from the properties standing in the name of Francis and from 505 Bloomfield street, crediting the same to Francis' estate and charging the account with expenditures on account of the properties and with cash paid to the complainants Nora and Thomas F. Bowes, and on May 20th, 1918, the estate account was again overdrawn to the extent of $6,459.55. A final settlement was then had between Nora and Thomas F. Bowes on the one hand and Thomas Bowes on the other and to cancel this overdraft, Nora and Thomas F. conveyed to Thomas 520 Grand street and the lot on the corner of Grand and Sixth streets. The complainants concede such indebtedness and admit that its cancellation was a fair consideration for said conveyance. At the same time William conveyed to Thomas F. the property 505 Bloomfield street. It is my conclusion that the facts I have recited show that there was a fair accounting made by the firm of Bowes Brothers for Francis' interest in the firm's real property and that the complainants received all they were entitled to receive for Francis' share in the real property described in the declaration of trust, as well as in all other real estate owned by the firm prior to his death and including a one-fifth interest in a parcel acquired by the firm two years after his death.

"The complainants contend that the inventories, *Exhibits*

*D-1* and *D-5* cannot be considered as evidence against them or Francis' estate because they were prepared after Francis' death. They were produced from the files kept in the firm's office; they are in the handwriting of Richard, under whose supervision the books were kept, and they were compiled from entries shown by the testimony to be in the books of account and being records of the firm's transactions made in the course of business are as competent as evidence as if the inventories had been entered in the firm's journal.

"The complainants dispute the firm's right to charge as liabilities of the firm the items shown on *Exhibit D-5* as 'Special Loans' made by some of the partners to the firm, namely, $722.75 made by Thomas, $1,839.73 made by William, and $46,324.17 made by Richard. They do not deny that the items appear on the books but they set up two reasons for their position: First, because the books on which the items appear were kept under Richard's supervision and were not partnership books. Richard was tax collector of Hoboken thirty-one years and his office was at the city hall, a few blocks from the firm's office. The real estate ledger and the cash book, the latter containing consecutive entries of cash received from all sources and of money paid out, as well for the plumbing business as for real estate transactions, were kept under Richard's supervision at his city hall office by a bookkeeper, Charles Holland, employed there until Holland's death in 1910, when the books were taken to the firm's office and kept there by a new bookkeeper. The entries therein up to 1910 are in Holland's handwriting. The complainants' argument is that the entries in these books are not binding on them as partnership entries because the books were not kept at the firm's office until sometime after Francis' death and it is not shown that he knew of the books' existence. As a partner Francis must have known that a record was being kept of the firm's extensive real estate transactions from 1875 to his death in 1898, and as he was at the firm's office daily, he must also have known that the real estate ledger and cash book were not there. If the books kept under Richard's supervision were not being so

kept with the knowledge of the partners and were not true records of partnership transactions, then no record of the partnership real estate dealings existed. The complainants' theory seems to be that Richard was keeping secret books of account at the city hall for the purpose of defrauding Francis, but if he was defrauding Francis, he must also have been defrauding his other brothers, or they were parties to Richard's fraudulent acts, a supposition which finds no support in the evidence, and Holland, the bookkeeper, must have had knowledge of the fraud and the record of it was disclosed to the new bookkeeper who took charge of the books in 1910. I think that these books were kept at Richard's office for the convenience of the firm, because a bookkeeper was there and with the knowledge and consent of all the partners, and that they must be regarded as partnership books and that the entries therein must be considered as having been made in the regular course of the firm's business. The second reason urged by the complainants against the evidential force of the 'special loans' set down on *Exhibit D-5* as liabilities of the firm, is that the items which make up the totals are not shown to have been anything more than voluntary contributions to the firm made by the partners named; that there is nothing on the books to indicate that any partner should be charged with excess drawings or should receive credit for cash paid into the firm by him. No inaccuracy in the books as against the complainants is pointed out. The defendants' expert accountant verified the postings from the cash book to the ledger and the complainants' expert accountant did not dispute them. The complainants say that it is a fair inference that the drawings represent compensation allowed each partner for services rendered the firm and that excess drawings by one partner over the other indicate payments made him for excess time devoted to the firm's business and that it is also a fair inference that cash paid into the firm by some partners was intended as an equalization by the contributing partners for their failure or inability to give as much time to the firm's business as was given by a partner who did not contribute. I think

that the manner in which the entries were made in the books negatives such inferences. There is no account on the books showing that any partner was paid wages or salary for his services. Each partner's withdrawals were charged against the account of real estate owned by him, whereas had such withdrawals represented compensation for services, he would not have been debited with them, but they would have been charged to an expense or salary account. The cash contributions made by each partner were credited to his personal real estate account, whereas had they been intended as payments made in equalization for services not rendered, they would have been credited to the account of the partner who rendered the most service. The complainants allege that Francis devoted more time to the business than Richard, notwithstanding which Francis received nothing in payment for his services other than his small withdrawals. The proof does not satisfy me that Francis rendered more service to the firm than Richard, and while his actual cash withdrawals may be described as small, he reecived compensation for his services through firm profits which were invested in real estate, of which three parcels were conveyed to him and he had a one-fifth share in the trust and other undivided real estate. There is no evidence to show what portion of their time the partners were to give to the business. Although Richard held public office thirty-one years, he was at the firm's office practically every night and morning and he was responsible for the bookkeeping of the cash and real estate accounts. He turned his official salary over to the firm and made other cash contributions, the whole totaling $46,324.17. Thomas and William also contributed to the firm, but Francis contributed nothing and the contributions of Richard, Thomas and William went into the purchase of real estate, in all of which Francis or his estate received an equal share. Under the circumstances of this case and in the absence of proof that cash contributions made by certain partners to the firm were intended as gifts, I must hold that such sums were loans and properly charged as partnership liabilities when *Exhibit D-5* was prepared for the purpose of ascertaining

the value of Francis' interest in the firm. The complainants also urge that Francis' overdraft of $14,143.17 should have been shown on *Exhibit D-5* as an asset of the firm and credit given him thereon for a one-fifth interest therein. This presents a question of opinion as to the proper method of bookkeeping, but if the complainants' opinion is the better and Francis was entitled to credit for one-fifth of $14,143.17, or $2,828.63, it must be remembered that his indebtedness to the firm was not wholly discharged by payment. Credit was given his estate by the allowance of $7,000 for the value of his interest in the firm's assets and the balance of the debt was forgiven.

"The complainant, Thomas F. Bowes, further contends that *Exhibit D-5* included real estate only and had no reference to Francis' interests in merchandise and bills receivable belonging to the plumbing business and that the defendants should account to him for such plumbing assets. Plumbing work ceased to be an important factor in the firm's business prior to Francis' death and was gradually almost abandoned. The partners were growing too old to engage in such work themselves and when Francis died the firm was managing $190,000 worth of real estate carried in the 'real estate account,' the 'Neff property,' valued at $25,000 and some twenty other parcels which had been conveyed to the partners, the value of which is not before me. The plumbing business was then an unimportant part of the firm's business and its net income is not shown on the books. Cash received from plumbing work was treated in the same way as cash received from rents and from the intermingled cash receipts were drawn all moneys required to pay for plumbing merchandise and labor, taxes, interest, repairs to real estate and withdrawals by the partners. There is no record of any plumbing merchandise on hand at Francis' death and the complainants have not shown that any such merchandise then existed. The firm had a cash balance of $485.79 as of December 15th, 1898, and there were some two hundred bills receivable due to the firm, all small items, the total of which is not shown, but an attempt to collect them developed that

eighty per cent. were bad. In the cash balance and bills receivable, Francis had a one-fifth interest, but it could not be. that such interest would equal the more than $7,000 overdraft against his account, which the surviving partners canceled without payment. No fraud is alleged or appears in the settlement made in 1902 between Francis' administrator and Nora Bowes, individually and as guardian of Thomas F. Bowes, or in the final settlement made in 1918 between the administrator and Thomas F. Bowes. In 1918 Thomas F. Bowes was twenty-eight years of age and he had then been a member of the bar of this state three years. The administrator was then chargeable with any interest Francis had in the personal property belonging to the plumbing business, and said complainant was informed that instead of there being any such interest, Francis' estate was chargeable with a large overdraft. He could have questioned the correctness of the administrator's statement and could have demanded an examination and audit of the firm's books, but he did not do so; he executed a release in full to the administrator. Eight years have elapsed since he had the opportunity to assert his present claim and all parties (except William) who could have explained the books or testified as to the firm's transactions are dead. I think the complainant should not now be heard to assert this part of his claim.

"The bill of complaint in each case will be dismissed."

*Mr. Thomas F. Bowes,* for the appellant.

*Messrs. Collins & Corbin,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Fielder.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, KALISCH, CAMPBELL, LLOYD, CASE, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, DEAR, JJ. 12.

*For reversal*—None.